**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MARIANA DUBREU and TRAIAN SAVA, individually and on behalf of all those similarly situated, | ) | |
| Plaintiffs, | ) | Civil Action No. 1:26-cv-05330 |
| v. | ) | **Class Action** **Jury Trial Demanded** |
| HEAVEN HILL DISTILLERIES, INC. d/b/a PREMIUM IMPORTS, LTD. and TIERRA DE AGAVES, S. de R.L. de C.V., | ) | |
| Defendants. | ) | |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs MARIANA DUBREU and TRAIAN SAVA on behalf of themselves and all those similarly situated, bring this First Amended Class Action Complaint against Defendants, alleging as follows:

## INTRODUCTORY STATEMENT

1. Plaintiffs MARIANA DUBREU and TRAIAN SAVA bring this consumer class action against Defendants Heaven Hill Distilleries, Inc. d/b/a Premium Imports, Ltd. and Tierra de Agaves, S. de R.L. de C.V. ("Defendants") for deceiving American consumers by selling tequila falsely labeled as "100% agave" when it is not.

2. Defendants import and sell Lunazul Tequila, a line of spirits they market as premium "100% agave" products, in Illinois, California, and across the United States.

3. The central allegation in this action is straightforward: Defendants market Lunazul Tequila as "100% agave" to Illinois and nationwide consumers, but the product does not live up

to that claim.

4. Every bottle of Lunazul Tequila sold in the United States bears the claim "100% agave" on the label. Defendants repeat and reinforce these claims across their website, social media, and point-of-sale marketing[1].

5. A reasonable consumer reading "100% agave" or "100% de agave" on a tequila bottle understands it to mean exactly what it says: every drop of liquid in the bottle came from fermented agave sugars, with no cane, corn, or other non-agave sugar source introduced at any stage of production. That understanding is consistent with Mexican regulations governing the designation and with the industry's own marketing of "100% agave" tequilas as the premium, authentic category of the spirit.

6. Beyond the compositional claim, Defendants tout Lunazul Tequila's quality and purity on every distribution channel available to them. Lunazul claims that the tequila does not contain any additives: sugar, glyceryn, vanilla, etc.

7. The false "100% agave" claim goes to the very essence of what Lunazul is sold as. Premium tequila consumers seek out the designation precisely because it carries well-understood qualitative meaning. Defendants exploit that consumer expectation to extract prices well above those charged for tequilas that honestly disclose a blended sugar composition.

8. During the Class Period (defined below), Defendants extracted a price premium from consumers by labeling Lunazul Tequila "100% agave" or "100% de agave" when it is not. This lawsuit challenges that conduct.

9. The "100% agave" claim drove Plaintiffs' and Class Members' purchasing

---

[1] Every bottle of Lunazul Tequila sold in the United States bears the claim "100% de Agave" on the label. The phrases "100% agave" and "100% de Agave" are used interchangeably throughout this Complaint; "100% de Agave" is the Spanish-language equivalent of "100% agave" in English and carries the identical meaning.

decisions and the prices they paid. Consumers wronged by this misrepresentation have no meaningful recourse through federal channels. The TTB's COLA program[2] is a label-format clearance, not a truth-in-labeling guarantee; it provides no private cause of action, no damages remedy, and no class mechanism. Courts in this Circuit have consistently held that TTB label approval does not preempt state consumer-fraud claims challenging whether a label's representations are accurate.

10. Plaintiffs and other consumers buying tequila labeled "100% Agave" reasonably take that statement at face value: the spirit inside was fermented from agave sugars only. The phrase "100% agave" is an absolute claim. By its plain meaning, the numeral 100% admits no qualification, no margin, and no exception; it leaves no room for any non-agave ingredient. A representation that a product is "100% agave" is therefore not a matter of degree but a categorical assertion: any addition of non-agave sugar, in any amount, makes the claim false. That straightforward misrepresentation is what enabled Defendants to collect a measurable price premium on every bottle sold.

11. Accredited laboratory analysis confirms what the label denies: Lunazul Tequila products bearing the "100% agave" designation contain ethanol that derives, in material part, from sources other than agave.

12. Nothing in this Complaint asks the Court to second-guess Mexico, invalidate Mexican regulations, or disturb any act of the CRT or the Secretaría de Economía. This lawsuit is brought solely under United States and state law, against a Kentucky corporation and its Mexican

[2]A "COLA," or Certificate of Label Approval, is a label-format clearance issued by the federal Alcohol and Tobacco Tax and Trade Bureau (TTB) pursuant to 27 U.S.C. § 205(e) and 27 C.F.R. Part 5. The COLA process reviews whether a proposed label's text, placement, and mandatory disclosures comply with TTB formatting requirements. The TTB does not test the product, does not verify compositional or botanicalorigin claims, and does not certify that any statement on the label is true. Issuance of a COLA confers no immunity from state consumer-protection actions challenging the accuracy of label representations.

production partner, for conduct directed entirely at U.S. consumers. Plaintiffs do not deny that Lunazul Tequila is authentic tequila, produced in the designated region of Mexico, at a CRT-certified facility, and in compliance with NOM-006-SCFI-2012's production requirements in all other respects. The sole issue is compositional: whether the ethanol in the bottle is derived exclusively from agave sugars, as the "100% agave" label represents.

13. Lunazul Tequila is manufactured at an industrial-scale facility in Tequila, Jalisco, Mexico. On its own brand page, Heaven Hill represents that "Lunazul is distilled at Tierra de Agaves using time-honored techniques, sustainable practices, and aging in Heaven Hill Bourbon barrels."[3] A facility operating at that scale has the ability to introduce non-agave sugars in the fermentation process.

14. Defendants distribute Lunazul Tequila through thousands of retail outlets nationwide, grocery chains, big-box stores, specialty liquor retailers, and independent shops, in Illinois, California, and across all fifty states. In every outlet, the product carries the same front-label "100% agave" representation and is marketed through the same uniform packaging and promotional messaging.

15. Plaintiffs and Class Members purchased Lunazul Tequila in reliance on the "100% de agave" representation and paid more for the product than they would have paid for an honestly labeled blended-sugar tequila. That price premium is their economic injury.

16. Plaintiffs purchased tequila and would purchase Lunazul Tequila again, but if they cannot rely on Defendants' '100% agave' representation, they face an ongoing risk of repeat deception.

17. Plaintiffs bring this action to recover those damages and to obtain restitution,

---

[3]See Heaven Hill Brands, Lunazul Tequila, https://heavenhill.com/brands/lunazul-tequila/ (last visited by counsel May 4, 2026)

injunctive relief requiring accurate labeling, and all other appropriate relief, on behalf of themselves and every similarly situated consumer who was overcharged for a bottle of Lunazul Tequila.

## NATURE OF THE ACTION

18. Mariana Dubreu and Traian Sava, individually and on behalf of all similarly situated consumers, seek compensatory damages, disgorgement of Defendants' unjust profits, declaratory relief, a permanent injunction requiring truthful labeling, attorneys' fees and costs, and all other relief the Court finds just and proper, against Heaven Hill Distilleries, Inc. d/b/a Premium Imports, Ltd. and Tierra de Agaves, S. de R.L. de C.V. The claims asserted include violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, the Illinois Uniform Deceptive Trade Practices Act, California's Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750 et seq.) and Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 et seq.), the consumer-protection statutes of an additional 22 states, negligent misrepresentation, breach of express warranty, and unjust enrichment. This action does not seek to disturb any Mexican certification or regulatory determination, relitigate any proceeding under Mexican law, or impose obligations on any official Mexican entity. The claims address only what Defendants, as U.S. commercial actors, told U.S. consumers on U.S. retail shelves.

## PARTIES

19. Plaintiff Mariana Dubreu ("Dubreu") is an adult resident of Los Angeles County, California. She purchased Lunazul Tequila at a retail store in Riverside County, California, as described below.

20. Plaintiff Traian Sava ("Sava") is an adult resident of Cook County, Illinois. He purchased Lunazul Tequila at a retail store in Lake County, Illinois, as described below.

21. Plaintiffs bring this action individually and as representatives of all consumers who purchased Lunazul Tequila during the Class Period and suffered injury from the same deceptive labeling.

22. Defendant Heaven Hill Distilleries, Inc., a Kentucky corporation with its principal place of business at 1064 Loretto Road, Bardstown, Kentucky 40004, conducts operations under the trade name Premium Imports, Ltd. In that capacity, Heaven Hill serves as the U.S. importer of record for all Lunazul Tequila products sold in America and is the brand owner responsible for the label representations at issue in this litigation.

23. Defendant Tierra de Agaves, S. de R.L. de C.V. ("Tierra de Agaves") is a Mexican limited liability company (sociedad de responsabilidad limitada de capital variable) organized under the laws of Mexico, with its principal place of business at Carretera Internacional Guadalajara–Nogales Km. 52.5, Tequila, Jalisco, C.P. 46400, Mexico. Tierra de Agaves owns and operates the industrial distillery identified by NOM 1513 where every bottle of Lunazul Tequila sold in the United States is produced. The back label of every bottle of Lunazul Tequila sold in the United States states that the product is "Crafted and bottled by Tierra de Agaves, S. de R.L. de C.V." at that address and bears the designation "NOM 1513 CRT." Tierra de Agaves functions as Heaven Hill's production partner and is the entity with direct knowledge of and control over the fermentation inputs used to manufacture Lunazul Tequila.

24. Both Defendants are private entities. The precise division of responsibilities, contractual arrangements, and decision-making authority between them will be further developed through discovery.

## JURISDICTION AND VENUE

25. Plaintiffs bring this case as a national class action on behalf of every consumer who

purchased Lunazul Tequila in the United States during the Class Period.

26. Upon information and belief, during the Class Period (May 2021 through the present), Defendants sold approximately 54 million bottles of Lunazul Tequila in the United States, representing approximately 4.5 million nine-liter cases. According to industry data reported by Impact Databank and The Spirits Business[4], Lunazul sold 620,000 cases in 2021, 918,000 cases in 2022, 1.27 million cases in 2023, and 1.7 million cases in 2024, making it one of the fastest-growing tequila brands in the country. At a retail price of $19.99 per 750ml bottle, Defendants generated in excess of $1 billion in US retail sales during the Class Period.

27. Illinois constitutes a significant market for Heaven Hill, with Lunazul Tequila products widely distributed and sold through major retailers such as Binny's Beverage Depot, Kroger, Walmart, as well as numerous grocery stores and liquor retailers throughout the state. Illinois, as one of the largest tequila-consuming states, accounts for a material share of that volume. Out of the approximately 54 million bottles sold nationally, Plaintiffs estimate that at least 2 million bottles were sold in Illinois, based on Illinois's share of national tequila consumption.

28. The proposed Nationwide Class encompasses every consumer who purchased Lunazul Tequila in the United States during the Class Period. Defendants sold approximately 54 million individual 750ml bottles bearing the "100% de agave" or "100% agave" representation. Even at a conservative average of five purchases per class member, the class would exceed 10 million individuals, making joinder wholly impracticable.

29. This Court has jurisdiction over this matter under the Class Action Fairness Act, 28

[4]Impact Databank, Shanken Commc'ns, Inc. (2024 ed.); see also Lunazul Tequila Passes 1m Cases for First Time, The Spirits Bus. (Jan. 25, 2024), https://www.thespiritsbusiness.com/2024/01/lunazul-tequilapasses-1m-cases-for-first-time/. See also Shanken News Daily, Impact Databank: Don Julio, Lunazul, Espolòn Drive Growth In Tequila (Feb. 20, 2025), https://www.shankennewsdaily.com/2025/02/20/36945/ impact-databank-don-julio-lunazul-espolon-drive-growth-in-tequila/.

U.S.C. § 1332(d), because this is a proposed class action in which: 1) there are at least 100 Class Members, in fact, the Class comprises millions of consumers; 2) the combined claims of Class Members vastly exceed $5,000,000, exclusive of interest, attorneys' fees, and costs, nationwide damages from the $2.00 per bottle price premium alone exceed $108 million; and 3) Defendants and Class Members are citizens of different states.

30. This Court has jurisdiction over Plaintiffs' state law claims as part of CAFA original jurisdiction under 28 U.S.C. § 1332(d), because those claims arise from the same common course of conduct giving rise to CAFA jurisdiction. In the alternative, the Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367, because those claims form part of the same case or controversy and arise from a common nucleus of operative facts. All of Plaintiffs' claims arise from Defendants' uniform marketing, labeling, and distribution of Lunazul Tequila products throughout the United States.

31. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred here. Plaintiff Sava purchased Lunazul Tequila in this District after being exposed to and relying upon Defendants' misleading labeling and marketing. Defendants marketed, distributed, and sold the products throughout this District, and the challenged representations were displayed to consumers here through product packaging, point-of-sale materials, and other marketing channels. Accordingly, a substantial portion of the conduct at issue occurred in this District.

**LUNAZUL TEQUILA**

32. Tequila is a regulated agave distillate produced from the fermented mash of the agave plant. Mexican law prescribes detailed requirements governing fermentation, distillation,

aging, and bottling, and sets permissible alcohol content between 35% and 55% ABV[5].

33. The "100% agave" designation is fundamentally different from "tequila" itself, which functions as a geographical indication ("GI"), a designation of origin certifying that the spirit was produced in specified regions of Mexico. "100% agave," by contrast, is not a GI or appellation; it is a compositional claim about the contents of the bottle. It does not tell the consumer where the product was made, it tells the consumer what the product is made of. When Defendants print "100% de agave" on a Lunazul Tequila label, a reasonable consumer understands that statement as a direct representation that the spirit in the bottle was derived exclusively from fermented agave sugars. Defendants provide no disclaimer, no asterisk, and no qualification suggesting that "100% agave" reflects only a Mexican regulatory certification rather than a literal description of the bottle's contents. A reasonable consumer reading that label has no basis to understand it as anything other than what it plainly says.

34. The disjunction between "tequila" and "100% agave" is mirrored in the federal trademark register. The term "TEQUILA" is itself registered as a certification mark on the United States Principal Register, owned by Consejo Regulador del Tequila, A.C., for distilled spirits distilled from the agave plant.[6] By contrast, the phrase "100% AGAVE" is not registered as a trademark or certification mark in the United States. The U.S. Patent and Trademark Office treats "100% AGAVE" as merely descriptive of the goods, indicating, on its face, that the spirit is made entirely from agave, and routinely requires applicants whose marks include the phrase to disclaim it apart from the mark as shown.[7]

---

[5] "ABV" refers to alcohol by volume, the volumetric percentage of pure ethanol contained in an alcoholic beverage measured at 20°C, expressed as the volume of ethanol divided by the total volume of the beverage.

[6] TEQUILA, U.S. Reg. No. 5,225,126 (registered June 13, 2017) (certification mark) (owner: Consejo Regulador del Tequila, A.C.).

[7] See, e.g., U.S. trademark application records reflecting that the USPTO routinely treats "100% AGAVE" and "100% DE AGAVE" as merely descriptive of tequila products and requires applicants to disclaim the phrase apart

35. The reason "100% agave" cannot be appropriated by any private party is precisely the reason consumers can rely on it: it is a literal, factual description of compositional content, not a brand. "Mixto," likewise, is not a registered trademark; it is the generic Mexican regulatory term for tequila produced with a blend of agave and non-agave sugars. Because "100% agave" operates only as a literal description of composition and is incapable of private trademark control, the words on Defendants' bottles are read by reasonable consumers as a factual statement about what is in the bottle.

36. For consumers, the "100% agave" label is a reliable signal of authenticity and purity, the product equivalent of a quality mark in a category where the composition of the spirit directly determines its character.

37. Consumers pay a meaningful price premium to purchase "100% agave" tequila over blended alternatives. Plaintiffs did exactly that when they chose Lunazul Tequila over less expensive mixto options.

38. The distinction between "100% agave" and "mixto" (a minimum of 51% agave sugars) is the primary pricing driver in the tequila category. Accurate labeling is therefore essential both to consumer choice and to honest competition among tequila producers.

39. Heaven Hill prices and promotes Lunazul Tequila as a premium spirit, and sells it at a substantial markup over honestly labeled blended tequilas.

40. On every bottle label and throughout their marketing and advertising, Defendants state that Lunazul Tequila products are made from "100% agave" or "100% de agave."

41. In addition to the "100% agave" representation, Defendants also affirmatively represent to consumers that Lunazul Tequila contains "zero additives." Defendants' official

---

from the mark as shown. The USPTO has no record of a registration for "100% AGAVE" or "MIXTO" as standalone marks for distilled spirits.

website prominently advertises the product as "[h]andcrafted with 100% Blue Weber agave and zero additives" under the tagline "All Agave. No Extras."[8] (Defendants' use of "Blue Weber" refers to Agave tequilana Weber, var. azul, the agave species from which 100% agave tequila must be made.) This "zero additives" representation compounds the deception: it assures consumers that the product is a pure, unadulterated spirit free from any extraneous ingredients, when in fact the product's ethanol is not exclusively derived from agave sugars as represented.

42. These statements appear prominently on the principal display panel of every bottle and are designed to communicate to the purchasing consumer that no source of alcohol other than the agave plant was used in making the product.

43. The "100% de Agave" claim is applied uniformly to all Lunazul Tequila product lines, Blanco, Reposado, and Añejo, through every distribution channel, in every state where the product is sold.

Fig. 1: Lunazul Tequila: Front Label




44. Defendants are well aware that tequila buyers treat the "100% de Agave" label as the industry's primary quality indicator.

---

[8] Our Tequilas, Lunazul Tequila, https://lunazultequila.com/our-tequilas.php (last visited by counsel on Apr. 29, 2026).

45. When Plaintiffs purchased Lunazul Tequila, the front label of each bottle prominently displayed the representation "100% de Agave" in large type on the principal display panel and on the cap seal. No disclaimer, qualification, or asterisk was provided.

46. Defendants publicly represent on their official website and marketing materials that Lunazul Tequila is produced at a distillery in Tequila, Jalisco, Mexico, bearing NOM 1513 (Norma Oficial Mexicana). The brand describes a process in which 100% agave plants are 'tended to and cared for by Lunazul's team,' the piñas are 'slow cooked,' the cooked piñas are 'shredded and rinsed, leaving only the pure agave sugar,' the agave sugars are then fermented with Defendants' 'proprietary yeast, a family strain used for generations,' and 'each batch is distilled twice in custom cognac stills.' Because each bottle bears the NOM 1513 designation identifying the producing distillery, these representations convey that all Lunazul Tequila is manufactured and bottled at the same Tierra de Agaves facility.[9]

47. Each bottle of Lunazul Tequila sold during the Class Period bore the "100% de Agave" representation on the principal display panel.

48. The "100% Agave" claim anchors Defendants' premium pricing strategy. As the scientific testing described below confirms, however, Lunazul Tequila does not consist entirely of fermented agave sugars.

49. The designation "100% Agave" on Lunazul Tequila is not a voluntary marketing claim, it is a mandatory, non-deviable compositional standard from which no deviation is legally permissible.

50. "100% agave" tequila is produced solely from fermented agave sugars and is prized for its clean, authentic agave character. "Mixto" tequila, by contrast, must contain at least 51%

---

[9]See Lunazul Tequila, The Process, https://lunazultequila.com/our-process.php (last visited by counsel Apr. 29, 2026); Lunazul Tequila, Our Story, https://lunazultequila.com/our-story.php (last visited by counsel Apr. 29, 2026).

agave sugars but may be supplemented with up to 49% non-agave fermentable sugars, typically cane or corn sugar, during fermentation. The two categories command meaningfully different prices in the market.

51. At prevailing retail prices in Illinois, a bottle of Lunazul Tequila Blanco (priced at $21.99) costs approximately $5.00 more than Jose Cuervo's Especial Silver (priced at $16.99), representing a roughly 29% premium attributable directly to the "100% agave" designation.

52. Compared to Sauza Hacienda Silver tequila (priced at $14.99), a bottle of Lunazul Tequila Blanco (priced at $21.99, discounted from $22.99) commands a $7.00 premium - approximately a 46.7% markup over an honestly labeled blended product.




Fig. 2: Screenshots from https://www.binnys.com/ (Visited by counsel on May 4, 2026)

53. The same analysis applies to consumers in California and in each state nationwide.

54. Because Defendants falsely labeled Lunazul Tequila as "100% agave," consumers paid at least $5.00 (29%) more per bottle than they would have paid for a comparably produced mixto tequila. Had Plaintiffs known the truth about Lunazul's composition, they would not have

purchased the product at the price charged, or at all. The overcharge is Plaintiffs' economic injury, quantifiable on a class-wide basis by reference, at a minimum, to the price differential between honestly labeled 100% agave tequila and mixto tequila sold in the same retail channels during the Class Period.

55. Publicly disclosed isotopic testing by an independent, internationally accredited laboratory has analyzed Lunazul Tequila products of the same type as those purchased by Plaintiffs, bearing on whether Defendants' "100% agave" representations are accurate. Although bulk Isotope Ratio Mass Spectrometry ("IRMS") cannot reliably distinguish ethanol derived from agave (a Crassulacean Acid Metabolism, or "CAM," plant) from ethanol derived from sugarcane or maize (C4 plants), a well-documented limitation of that technique,[10] the Carbon-13 Site-Specific Natural Isotope Fractionation Nuclear Magnetic Resonance ("13C SNIF-NMR") method employed in the testing described below is recognized to overcome that limitation and to enable position-specific authentication of agave ethanol.

56. Stable isotope ratio analysis is among the most reliable tools available for verifying the botanical origin of food and beverage components. Biologically active elements, carbon, hydrogen, oxygen, and nitrogen, occur naturally in fixed isotopic forms ($^{13}C/^{12}C$, $^{2}H/^{1}H$, $^{18}O/^{16}O$, $^{1}5N/^{1}4N$) whose distribution patterns are shaped by the metabolic pathways of the source organism. These fingerprints enable forensic identification of the botanical, geographic, or synthetic origin of specific compounds in a finished product.

57. Carbon isotope analysis measures the signature left in ethanol by the metabolic

[10] See F. Thomas, C. Randet, A. Gilbert, V. Silvestre, E. Jamin, S. Akoka, G. Remaud, N. Segebarth & C. Guillou, Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol, 58 J. Agric. Food Chem. 11580 (2010), https://doi.org/10.1021/jf102983v (explaining that conventional bulk carbon-isotope analysis cannot reliably distinguish ethanol derived from agave (a CAM plant) from ethanol derived from sugarcane or maize (C4 plants) because the bulk $\delta^{13}C$ distributions of the two sources overlap).

processes of the plant from which its sugars were derived, enabling identification of whether the fermentation feedstock was agave (a CAM plant), sugarcane or corn (C4 plants), or a blend. This methodology is employed throughout the European Union, is recognized by the International Fruit Juice Union (IFU) and the International Organisation of Vine and Wine (OIV), and is accredited by COFRAC (Comité Français d'Acréditation), France's sole national accreditation authority.

58. The carbon isotope pattern of ethanol fermented from agave differs in quantifiable, reproducible ways from the pattern of ethanol derived from sugarcane or corn. These differences are large enough to be detected reliably by both SNIF-NMR and EA-IRMS methods.

59. Publicly disclosed testing by Eurofins Analytics France, Authenticity ("Eurofins"), a laboratory accredited by COFRAC under COFRAC TESTING scope 1-0287, analyzed bottles of Lunazul Tequila under documented chain of custody using COFRAC-accredited C13 SNIF-NMR® analysis on ethanol and EA-IRMS to measure position-specific and bulk carbon isotope ratios. Among the resulting analytical reports, each signed by a Eurofins Analytical Expert, are the following: Lunazul Añejo, 750ml: Analytical Report No. AR-25-AA-055779-01, sample received November 24, 2025, reported December 3, 2025. Results: $\delta^{13}C$ $CH_2 = -13.2$ (±0.5)‰; $\delta^{13}C$ $CH_3 = -12.0$ (±0.5)‰; $\delta^{13}C$ bulk (EA-IRMS) = −12.6 (±0.3)‰. Finding: Not compliant.

60. Separate and independent laboratory testing confirms the same adulteration. In a further round of testing, a bottle of Lunazul Reposado (40% ABV) was submitted for analysis to Eurofins Analytics France - Authenticity, the COFRAC-accredited laboratory described above, which applied the same COFRAC-accredited $^{13}C$ SNIF-NMR® method on ethanol together with bulk carbon isotope analysis by EA-IRMS. The results were: $\delta^{13}C$ $CH_3 = -14.5$ (±0.5)‰; $\delta^{13}C$ $CH_2 = -13.1$ (±0.5)‰; $\delta^{13}C$ bulk (EA-IRMS) = −13.8 (±0.3)‰. A full sugar profile of the same sample found sucrose, glucose, fructose, maltose, and lactose all below the limit of detection, confirming

that the isotopic signature reflects the botanical origin of the ethanol itself and not any residual sweetener added after distillation. The laboratory's stated opinion was that the isotopic parameters measured were not in agreement with either a 100% or a 51% agave alcohol origin, with reference to its database of authentic samples. In other words, the ethanol in the Reposado sample was inconsistent not only with the "100% agave" designation on the label, but even with the 51% minimum agave content required for the product to be called "tequila" at all.

61. Across the tested expressions, the independent laboratory reached the same conclusion: "Not compliant." That finding directly refutes Defendants' "100% de Agave" label claims. A product whose ethanol is derived in material part from non-agave sources cannot lawfully or truthfully be sold as "100% agave."

62. Specifically, the adulteration detected in Lunazul Tequila products is not borderline. Site-specific carbon isotope analysis by SNIF-NMR shows that authentic agave ethanol has a characteristic internal isotope pattern in which the methylene (CH2) position is more enriched in 13C than the methyl (CH3) position, with a larger CH2-CH3 separation than that observed in sugarcane- or maize-derived ethanol.

63. The tested Lunazul Tequila products exhibited isotope ratios at both positions that deviate from this agave-derived pattern in a manner consistent with the systematic incorporation of C4-derived (sugarcane or corn) ethanol into the fermentation feedstock. The magnitude and direction of the deviation are inconsistent with natural variation in agave-derived ethanol and are instead diagnostic of adulteration with non-agave fermentable sugars.

64. Lunazul Reposado and Lunazul Añejo are produced by barrel-aging the same underlying Blanco spirit; they undergo no separate fermentation or distillation, and barrel-aging cannot alter the botanical origin of the ethanol. Because the tested Reposado and Añejo contain

non-agave ethanol, that ethanol was necessarily present in the Blanco spirit from which they were made. Every Lunazul expression, Blanco, Reposado, and Añejo, is therefore equally affected: none can accurately carry the "100% agave" designation.

65. Beyond the publicly disclosed testing results, the systemic implausibility of industry-wide "100% agave" compliance is confirmed by basic production arithmetic that the Mexican government and the CRT have failed to confront or remedy. According to data compiled by the Consejo Regulador del Tequila (CRT) and the Camara Nacional de la Industria Tequilera (CNIT), the tequila industry collectively reported producing approximately 598 million liters of tequila in 2023, of which approximately 427 million liters (or roughly 71%) were labeled as "100% agave."[11] The remaining 171 million liters contained at a minimum 51% alcohol derived from agave. These production volumes are mathematically irreconcilable with the available supply of mature agave.

66. A mature agave plant (Agave tequilana var. azul) produces a piña, the harvested core of the plant, typically weighing between 40 and 90 kilograms. Each such piña, when processed through baking, fermentation, and distillation under authentic production methods, yields approximately 3 to 5 liters of finished tequila at 40% ABV. The entire known supply of harvestable mature agave plants available in Mexico during the relevant period was therefore capable of yielding only a fraction of the volume of tequila that the industry officially reported producing as "100% agave."

67. The agave being harvested for 2024 tequila production was therefore planted

[11] See Consejo Regulador del Tequila, A.C., Estadísticas, https://www.crt.org.mx/ (last visited Apr. 29, 2026); see also Casa Aceves, The Growth of the Tequila Industry in 2023 and Its Social Commitment for 2024, https://casaaceves.com/the-tequila-industrys-steady-growth-in-2023-and-its-social-responsibility/ (last visited Apr. 29, 2026) (reporting 2023 total tequila production of 598.7 million liters, with 71% (approximately 427 million liters) labeled as 100% agave and 171 million liters as mixto).

approximately between 2014 and 2017. The tequila industry experienced a severe and documented agave shortage crisis during precisely that planting window. Industry reporting from 2018, including data attributed to the National Chamber of the Tequila Industry, indicated that the supply of mature blue agave available for harvest in Mexico fell well short of registered industry demand: only approximately 17.7 million plants planted in 2011 had matured for 2018 harvest, against industry demand of approximately 42 million plants for that year.[12]

68. Even under assumptions maximally favorable to the industry, that every harvestable agave plant were dedicated exclusively to producing 100% agave tequila and that each plant achieved peak theoretical yields, the underlying arithmetic still fails to reconcile with the volumes of "100% agave" tequila officially reported. This disconnect is further underscored by the substantial and growing diversion of agave into non-tequila uses: the global agave syrup market alone was valued in the hundreds of millions of dollars (roughly $645–$688 million annually in recent estimates), reflecting significant demand from food and beverage manufacturers.[13] Mexico continues to export agave-derived sweeteners internationally, including to the United States, a major consumption hub where agave syrup is widely used in commercial beverages and "clean-label" products.[14] Large beverage chains such as Starbucks have incorporated agave syrup into menu offerings as a sugar alternative, further evidencing that a meaningful share of blue agave production is diverted away from tequila entirely. Against that backdrop, the industry's reported

---

[12] See Heather Greene, We're Facing a Major Tequila Shortage, Here's What You Should Know, Wide Open Country (2018), https://www.wideopencountry.com/giant-tequila-shortage/; David Z. Morris, The Tequila Shortage You Might Have Read About Will Probably Be Over Sooner Than You'd Expect, Fortune (Dec. 7, 2019), https://fortune.com/2019/12/07/mexico-tequila-shortage-agave-plant/; Agave Crisis: Boom, Bust or Business As Usual?, TasteTequila (2018), https://tastetequila.com/2018/agave-crisis-boom-bust-orbusiness-as-usual/.

[13] See Future Market Insights, Agave Syrup Market Outlook (2023–2033), https://www.futuremarketinsights.com/reports/agave-syrup-market (last visited May 4, 2026).

[14] See Fortune Business Insights, Blue Agave Market Size, Share & Industry Analysis, https://www.fortunebusinessinsights.com/blue-agave-market-112146 (last visited May 4, 2026).

output of "100% agave" tequila becomes even less plausible when evaluated against the finite biological and agricultural constraints of agave supply.

69. Farmers were documented harvesting immature four-year-old plants in desperation during the shortage crisis, further depleting the future supply of properly matured agave available for subsequent production years. The agave shortage crisis is not disputed, it was widely reported by the tequila industry, Mexican agricultural regulators, and trade publications. The systemic production-arithmetic gap between reported "100% agave" output and the biologically constrained agave supply corroborates Plaintiffs' isotope testing results and supports the inference that adulteration with non-agave fermentable sugars is a widespread industry practice, not an isolated incident.

## ECONOMIC INJURY

70. Before buying Lunazul Tequila, each Plaintiff examined the front label of the bottle and read the prominent "100% Agave" claim. Each Plaintiff understood that representation to guarantee that the spirit in the bottle was fermented from agave sugars only, with no other sugar source used.

71. That label representation was central to Plaintiffs' purchasing decisions. Plaintiffs and all Class Members bought Lunazul Tequila specifically because of, and in reliance upon, the "100% agave" claim.

72. In every transaction, Plaintiffs and Class Members paid a price premium attributable entirely to the "100% agave" representation, a premium they would not have paid for an honestly labeled blended tequila.

73. If Defendants had accurately disclosed that Lunazul Tequila contained non-agave ethanol, Plaintiffs and Class Members would either have declined to purchase the product entirely

or would have paid the lower price appropriate for a blended tequila.

74. At all relevant times, Defendants had exclusive access to information about the fermentation inputs and production processes at the Tierra de Agaves facility and were uniquely positioned to know the true botanical origin of the ethanol in their products.

75. The adulteration alleged herein was not discoverable by ordinary consumers inspecting the product at point of sale. Advanced isotopic laboratory analysis is required to detect it. Moreover, the sole U.S. commercial laboratory through which SNIF-NMR testing on tequila can be obtained (a branch of the French laboratory Eurofins) declined to accept the analysis for Plaintiffs, citing a conflict of interest.

76. Accordingly, any applicable statutes of limitation were tolled until Plaintiffs were able to obtain and review accredited isotope testing results. Plaintiffs did not discover, and could not through reasonable diligence have discovered, the misrepresentation earlier.

**TOLLING OF THE STATUTES OF LIMITATION**

77. Any applicable statutes of limitation have been tolled by the discovery rule. Plaintiffs and Class Members did not discover, and could not reasonably have discovered, that Lunazul Tequila contains ethanol derived from non-agave sources until independent isotopic testing results became publicly available. The presence of non-agave ethanol cannot be detected by sight, smell, taste, or any inspection a consumer could perform at the point of sale or at home. It can be established only through position-specific carbon isotope analysis by the $^{13}C$ SNIF-NMR® method described in ¶¶ 55–64. That method is performed only by Eurofins, and although Eurofins operates laboratories throughout the world, including in the United States, the SNIF-NMR® analysis itself is performed at a single facility, Eurofins Analytics France – Authenticity in Nantes, France. A U.S. consumer seeking the test can obtain it only by submitting a sample through a Eurofins laboratory for referral to Nantes, and, as alleged in ¶ 75, Eurofins' U.S.

laboratory declined to accept Lunazul Tequila for that purpose, citing a conflict of interest. The only means of detecting the adulteration alleged herein was therefore, as a practical matter, unavailable to any ordinary consumer. A reasonable consumer had no reason to suspect that a product certified as "100% de Agave" under Mexican regulatory oversight, bearing a NOM number and a CRT designation, was anything other than what its label represented.

78. Any applicable statutes of limitation have also been tolled by Defendants' knowing and active concealment of the facts alleged herein. Defendants had exclusive control over, and exclusive knowledge of, the fermentation inputs used at the Tierra de Agaves distillery. Rather than disclose that non-agave sugars were used, Defendants affirmatively represented on every bottle that the product was "100% de Agave," reinforced that representation with the statements "100% Blue Weber agave and zero additives" and "All Agave. No Extras." on their website and marketing, and invoked the NOM 1513 designation and CRT certification as assurances of authenticity. These affirmative representations were not merely the underlying misrepresentation; they were designed to, and did, lull consumers into believing there was nothing to investigate. Defendants never corrected or qualified those statements at any time during the Class Period.

79. Plaintiffs and Class Members reasonably relied on Defendants' affirmative representations and had no reason to investigate their truth. Plaintiffs exercised reasonable diligence once they had reason to suspect the representations were false: as alleged in ¶ 75, when Plaintiffs sought SNIF-NMR® testing of Lunazul Tequila through Eurofins' U.S. operations, Eurofins declined to accept the work, citing a conflict of interest, and Plaintiffs were ultimately required to route samples to the Nantes facility through a Eurofins affiliate abroad in order to obtain accredited results. Plaintiffs could not, through the exercise of reasonable diligence, have obtained the information necessary to plead their claims any earlier than they did.

80. Independently, the statutes of limitation should be equitably tolled. Defendants' conduct, together with the structural unavailability of the testing needed to detect the adulteration, prevented Plaintiffs and Class Members from asserting their claims despite the exercise of due diligence. Defendants will suffer no prejudice from tolling, because they have at all times possessed the production records and fermentation-input data that establish the botanical origin of the ethanol in their products.

81. Defendants are estopped from relying on any statute of limitation as a defense because of their own affirmative misrepresentations and concealment. In any event, the named Plaintiffs' claims are timely without regard to tolling. Tolling is asserted on behalf of Class Members whose purchases predate the applicable limitations periods measured from the filing of this action.

**PLAINTIFFS**

82. Plaintiff Mariana Dubreu ("Dubreu") purchased one bottle of Lunazul Tequila (750ml) on March 26, 2026, at Albertsons Store #1641, 7070 Archibald Ave., Corona, California 92880, paying $19.99 plus tax (regular retail price $27.99, reduced by an in-store sale savings of $8.00). Prior to purchase, Dubreu read the "100% Agave" representation prominently displayed on the principal display panel of the bottle label and understood it to mean that the product was produced exclusively from fermented agave sugars with no non-agave sugar sources. This representation was material to Dubreu's decision to purchase Lunazul Tequila and to pay the price charged. Had Dubreu known that Lunazul Tequila contained ethanol derived from non-agave sources, she would not have purchased the product or would have paid materially less for it.

83. Plaintiff Traian Sava ("Sava") purchased one bottle of Lunazul Blanco Tequila (750ml) on March 30, 2026, at Binny's Beverage Depot, 85 N. Green Bay Rd., Glencoe, Illinois

60022, paying $21.99 plus tax (regular retail price $22.99, reduced by a Binny's Card savings of $1.00). Prior to purchase, Sava read the "100% Agave" representation prominently displayed on the principal display panel of the bottle label and understood it to mean that the product was produced exclusively from fermented agave sugars with no non-agave sugar sources. This representation was material to Sava's decision to purchase Lunazul Tequila and to pay the price charged. Had Sava known that Lunazul Tequila contained ethanol derived from non-agave sources, he would not have purchased the product or would have paid materially less for it.

84. Plaintiffs intend to purchase tequila products in the future, including Lunazul Tequila, and would consider purchasing Lunazul Tequila again if they could rely on Defendants' representation that the product is "100% agave." Plaintiffs regularly purchase tequila and prefer products that are accurately labeled with respect to their composition and quality. However, Plaintiffs cannot presently rely on the truthfulness of Defendants' "100% agave" representation and therefore face an ongoing risk of being misled in future purchasing decisions. Absent injunctive relief requiring Defendants to accurately disclose the composition of Lunazul Tequila, Plaintiffs will be unable to rely on the product's labeling and will be harmed by either forgoing future purchases they would otherwise make or by purchasing the product without confidence in the accuracy of its labeling.

85. Only after the public disclosure of independent scientific testing results did Plaintiffs learn that the spirit they had purchased was not what the label represented. Isotope analysis confirmed that Lunazul Tequila is not produced from 100% agave sugars.

86. The product Plaintiffs received is an industrially manufactured spirit adulterated with non-agave ethanol, not the pure, agave-only spirit the label promised them.

## CLASS ALLEGATIONS

87. Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

88. Plaintiffs assert each Count in this Complaint as a class action claim under Federal Rule of Civil Procedure 23.

89. Plaintiffs seek to represent all individuals who purchased Lunazul Tequila anywhere in the United States at any time from Defendants' initial distribution of the product in approximately May 2021 through the date of final judgment (the "Class Period").

90. Plaintiff Dubreu seeks to certify and represent the following classes on behalf of California consumers:

a. Nationwide Class: All consumers that purchased Lunazul Tequila in the United States.

b. California Subclass: All California residents that purchased Lunazul Tequila in California.

c. Multi-State Subclass: All consumers that purchased Lunazul Tequila in following states: Colorado, Connecticut, Delaware, District of Columbia, Hawaii, Idaho, Iowa, Kansas, Louisiana, Michigan, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, Oklahoma, South Carolina, Tennessee, Vermont, and Washington. The consumer protection statutes of these states are materially similar with the Illinois and California statutes. The respective statutes are: COLO. REV. STAT. § 61-102; CONN. GEN. STAT. § 42-110a; DEL. CODE ANN. tit. 6, § 2511; D.C. CODE ANN. § 28-3901; HAW. REV. STAT. § 480-1; IDAHO CODE § 48-603; 815 ILL. COMP. STAT. 510/1 (2024); IOWA CODE § 714.16; KAN. STAT. ANN. § 50-623 (2024); LA. STAT. ANN. § 51:1401 (2024); MICH. COMP. LAWS § 445.903;

MINN. STAT. § 325F.69; MONT. CODE ANN. § 30-14-101; NEB. REV. STAT. § 59-1601 (2024); NEV. REV. STAT. ANN. § 598.0903 (2024); N.H. REV. STAT. ANN. § 358-A:2 (2024); N.J. REV. STAT. § 56:8-2 (2024); N.M. STAT. ANN. § 57-12-2 (2024); N.Y. GEN. BUS. LAW § 349 (2024); OKLA. STAT. tit. 15, § 751 (2024); S.C. CODE ANN. § 39-5-10; TENN. CODE ANN. § 47-18-104 (2024); VT. STAT. ANN. tit. 9, § 2453 (2024); WASH. REV. CODE § 19.86.010 (2024); WIS. STAT. § 100.18 (2024). The consumer protection statutes of the states comprising the Multi-State Class are materially similar in that each prohibits deceptive or misleading acts in trade or commerce and permits recovery based on uniform misrepresentations to reasonable consumers. Any variations among these statutes do not defeat class treatment because Plaintiffs' claims arise from Defendants' standardized, materially identical labeling, marketing, and production practices, which are susceptible to common proof.

91. Plaintiff Sava seeks to certify and represent the following classes on behalf of Illinois consumers:

a. Nationwide Class (defined above).

b. Illinois Subclass: All consumers that purchased Lunazul Tequila in Illinois.

c. Multi-State Subclass: (defined above).

92. Excluded from all proposed classes are: counsel of record for Plaintiffs; any governmental entity; Defendants and any entity in which any Defendant has a controlling interest; Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; any judicial officer assigned to this matter and their immediate families and judicial staff; and any person whose individual interests are in conflict with those of the class.

93. Plaintiffs reserve the right to modify or refine class definitions through discovery, including by adding subclasses, narrowing class definitions, or limiting class claims to specific

issues as appropriate.

94. Members of the Nationwide Class and all Subclasses are referred to collectively throughout this Complaint as "Class Members."

95. Class treatment is appropriate under Federal Rule of Civil Procedure 23. The proposed classes are defined by objective, verifiable criteria, purchase of a specifically identified consumer product within a defined time period, and class membership is ascertainable through reliable means including sales records, loyalty program data, and consumer receipts.

96. Numerosity: Defendants sold approximately 4.5 million nine-liter cases of Lunazul Tequila during the Class Period, equivalent to more than 54 million individual 750ml bottles, every one of which bore the "100% agave" claim at issue.[15] Millions of consumers paid a premium based on that claim. The class is too large for joinder to be practicable.

97. Typicality: Plaintiffs' claims are typical of those of the classes they represent. Like every other class member, Plaintiffs purchased Lunazul Tequila in reliance on the same "100% agave" label claim, paid the same price premium, and suffered the same economic injury from the same standardized misrepresentation and uniform production practice.

98. Commonality: This case presents common questions of law and fact capable of class-wide resolution, including: (i) whether Lunazul Tequila products contain non-agave-derived ethanol; (ii) whether the "100% agave" representation is false or misleading; (iii) whether Defendants knew or should have known of the misrepresentation; and (iv) the appropriate measure of the price premium attributable to the false claim. All class members were exposed to the identical representation from a single production facility.

99. Adequacy: Plaintiffs will vigorously and fairly represent the interests of all Class

[15] See The Spirits Business, Lunazul Tequila Passes 1m Cases for First Time (Jan. 25, 2024); Shanken News Daily, Impact Databank: Don Julio, Lunazul, Espolon Drive Growth in Tequila (Feb. 20, 2025).

Members. Their interests are fully aligned with those of the classes they seek to represent, and they have no conflicts. Plaintiffs are represented by counsel with substantial experience in consumer class actions and alcohol labeling litigation who are committed to zealously prosecuting this case on behalf of the proposed classes.

100. Superiority: A class action is the superior mechanism for resolving this controversy. Common questions of law and fact, centered on a single product line, a single label representation, and a single production facility, overwhelmingly predominate over any individual issues. Absent class treatment, millions of consumers who paid a few dollars too much for a bottle of tequila would have no practical vehicle for seeking redress.

## COUNT I: VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

*(On behalf of Plaintiff Sava and the Illinois Subclass)*

101. Plaintiff Sava realleges and incorporates by reference all preceding paragraphs of this Complaint as if set forth fully herein. Plaintiff Sava brings this Count on his own behalf and on behalf of the Illinois Subclass, pursuant to Fed. R. Civ. P. 23.

102. The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 et seq., prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" in the conduct of trade or commerce. 815 ILCS 505/2.

103. Plaintiff Sava and each Illinois Subclass member is a "consumer" under 815 ILCS 505/1(e); Lunazul Tequila is "merchandise" under 815 ILCS 505/1(b); and each Defendant is a "person" engaged in "trade" and "commerce" under 815 ILCS 505/1(c) and (f).

104. Defendants' uniform "100% agave" labeling of Lunazul Tequila is a deceptive act

or practice in trade or commerce. Plaintiff Sava and the Illinois Subclass relied on that representation in deciding to purchase Lunazul Tequila and in paying the price charged, and suffered actual damages equal to the price premium attributable to the false claim.

105. Defendants' conduct is independently "unfair" under the ICFA: it offends the established public policy of truthful food and beverage labeling, is immoral and unscrupulous, and causes substantial injury that consumers cannot reasonably avoid because the adulteration is undetectable at the point of sale.

106. Plaintiff Sava and the Illinois Subclass are entitled to actual damages, punitive damages where permitted, injunctive relief, attorneys' fees and costs, and all other relief available under the ICFA.

**COUNT II: VIOLATIONS OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**

*(On behalf of Plaintiff Sava and the Illinois Subclass)*

107. Plaintiff Sava realleges and incorporates by reference paragraphs 1 to 100 of this Complaint as if fully set forth herein. He asserts this Count on his own behalf and on behalf of the Illinois Subclass.

108. The Illinois Uniform Deceptive Trade Practices Act ("DTPA"), 815 ILCS 510/1 et seq., was in full force and effect throughout the Class Period. Defendants violated the DTPA, including 815 ILCS 510/2(a)(5) and (a)(7), by representing through every bottle label that Lunazul Tequila possesses characteristics and contains ingredients that it does not in fact have.

109. Plaintiff Sava intends to purchase Lunazul Tequila again in the future if Defendants make accurate disclosures regarding its composition such that Plaintiff Sava can rely on the "100% agave" representation. Absent injunctive relief requiring truthful labeling, Plaintiff Sava and Illinois Subclass members will continue to encounter "100% agave" representations on Lunazul

Tequila bottles that they cannot independently verify at the point of purchase, creating an ongoing risk of future harm.

110. Plaintiff Sava and the Illinois Subclass seek injunctive relief and all other relief available under the DTPA.

**COUNT III: VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**
*(On behalf of Plaintiff Dubreu and the California Subclass)*

111. Plaintiff Dubreu realleges and incorporates by reference paragraphs 1 to 100 of this Complaint as if set forth fully herein. She brings this Count on her own behalf and on behalf of the California Subclass, pursuant to Fed. R. Civ. P. 23.

112. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 et seq., makes unlawful any "unlawful, unfair or fraudulent business act or practice." Defendants' "100% agave" labeling of Lunazul Tequila violates all three prongs: it is "unlawful" because it violates the CLRA and California's False Advertising Law (Cal. Bus. & Prof. Code §§ 17500 et seq.); it is "unfair" because it offends established public policy and harms consumers without offsetting benefit; and it is "fraudulent" because it is objectively likely to mislead reasonable consumers into believing the product contains exclusively agave-derived alcohol.

113. Plaintiff Dubreu intends to purchase Lunazul Tequila again in the future if Defendants make accurate disclosures regarding its composition such that Plaintiff Dubreu can rely on the "100% agave" representation.

114. Plaintiff Dubreu and the California Subclass suffered injury in fact and lost money as a result of Defendants' UCL violations and are entitled to restitution, disgorgement of Defendants' unjust profits, injunctive relief requiring accurate labeling, and all other relief available under Cal. Bus. & Prof. Code § 17203.

**COUNT IV: VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT**
**(Cal. Civ. Code §§ 1750 et seq.)**
*(On behalf of Plaintiff Dubreu and the California Subclass)*

115. Plaintiff Dubreu realleges and incorporates by reference paragraphs 1 to 100 of this Complaint as if fully set forth herein. She brings this Count on her own behalf and on behalf of the California Subclass, pursuant to Fed. R. Civ. P. 23.

116. The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 et seq., prohibits unfair and deceptive practices in transactions resulting in the sale of goods to consumers. Lunazul Tequila is a "good" under § 1761(a) and its retail sale to consumers is a "transaction" governed by the CLRA.

117. Defendants violated Cal. Civ. Code § 1770(a)(5) by representing that Lunazul Tequila has characteristics it does not have, and § 1770(a)(7) by representing that Lunazul Tequila meets the "100% agave" quality and grade standard when it does not.

118. Pursuant to Cal. Civ. Code § 1782, Plaintiff Dubreu has provided or will timely provide Defendants with written notice. At this time, Plaintiff Dubreu and the California Subclass seek injunctive relief, and all other relief available under the CLRA.

**COUNT V: VIOLATIONS OF THE CONSUMER PROTECTION LAWS OF VARIOUS STATES**
*(On behalf of Plaintiffs Dubreu and Sava and the Multi-State Subclass)*

119. Plaintiffs reallege and incorporate by reference paragraphs 1 to 100 of this Complaint. They bring this Count on their own behalf and on behalf of the Multi-State Subclass.

120. The consumer protection laws of the states represented in the Multi-State Subclass share the same core prohibitions against deceptive commercial conduct as the Illinois ICFA and the California UCL/CLRA. Defendants' uniform "100% agave" misrepresentations support liability under each.

121. Multi-State Subclass members are entitled to recover actual damages, restitution, disgorgement, injunctive relief, attorneys' fees and costs, and all other relief available under the analogous statutes of each represented state.

**COUNT VI: UNJUST ENRICHMENT**
*(On behalf of Plaintiffs Dubreu and Sava and the Nationwide Class)*

122. Plaintiffs reallege and incorporate by reference paragraphs 1 to 100 of this Complaint. This Count is pled in the alternative to Plaintiffs' statutory and common law claims, to the extent those claims are found to be inadequate or unavailable.

123. By paying premium prices for Lunazul Tequila through authorized U.S. retail channels, Plaintiffs and Class Members conferred a benefit on Defendants. Heaven Hill, as the brand owner, importer of record, and wholesale seller, received that benefit through the wholesale prices paid by retailers, which incorporated and were premised upon the "100% agave" premium.

124. Equity does not permit a defendant to retain gains derived from its own wrongdoing. Plaintiffs request full disgorgement of the unjust profits Defendants extracted through the false "100% agave" price premium.

**COUNT VII: NEGLIGENT MISREPRESENTATION**
*(On behalf of Plaintiffs Dubreu and Sava and the Nationwide Class)*

125. Plaintiffs reallege and incorporate by reference paragraphs 1 to 100 of this Complaint. They bring this Count on their own behalf and on behalf of the Nationwide Class.

126. Defendants owed consumers a duty of truthfulness in their commercial representations and breached that duty by making "100% agave" claims that were either known to be false or were made without reasonable care to ascertain their accuracy.

127. Plaintiffs and Nationwide Class members reasonably relied on those representations and suffered economic injury equal to the price premium paid.

128. Plaintiffs and Nationwide Class members are entitled to actual damages, punitive damages where permitted, injunctive relief, and all other relief available.

**COUNT VIII: BREACH OF EXPRESS WARRANTY**
*(On behalf of Plaintiffs Dubreu and Sava and the Nationwide Class)*

129. Plaintiffs reallege and incorporate by reference paragraphs 1 to 100 of this Complaint. They bring this Count on their own behalf and on behalf of the Nationwide Class.

130. By printing "100% Agave" on every bottle label and repeating those claims throughout their marketing, Defendants made express warranties to every purchaser that Lunazul Tequila was produced exclusively from agave sugars and contained no non-agave-derived ethanol. Those affirmations of fact about the character and composition of the goods became part of the basis of the bargain for each consumer who purchased Lunazul Tequila in reliance on that representation.

131. Defendants breached those express warranties by delivering Lunazul Tequila products whose ethanol derives, in material part, from non-agave sources. Plaintiffs and Nationwide Class Members are entitled to damages equal to the price premium paid, together with pre-judgment interest, attorneys' fees, costs, and all other relief the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

132. Plaintiffs, on behalf of themselves and all similarly situated Class Members, hereby demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, Mariana Dubreu and Traian Sava, respectfully request that judgment be entered in their favor and in favor of the Class Members as follows:

a. Certifying and maintaining this action as a class action, with the named Plaintiffs as designated class representatives and with their counsel appointed as class counsel;

b. Declaring Defendants in violation of each of the counts set forth above;

c. Awarding the Plaintiffs and those similarly situated compensatory, punitive, and treble damages in excess of $108,000,000 on a nationwide basis, and no less than $5,000,000 for the Illinois Subclass, exclusive of pre-judgment interest, post-judgment interest, and attorneys' fees;

d. Awarding the Plaintiffs and those similarly situated liquidated damages;

e. Order the disgorgement of ill-gotten monies;

f. Awarding each of the named Plaintiffs a service award;

g. Awarding pre-judgment, post-judgment, and statutory interest;

h. Awarding attorneys' fees and costs;

i. Awarding such other and further relief as the Court may deem just and proper.

Dated: September 10, 2026

Respectfully Submitted,

/s/ Bogdan Enica

Bogdan Enica, Esq.
Access Law Group
20283 State Rd. 7
Boca Raton FL 33498
Telephone: (305) 306-4989
Email: Bogdan@AccessLaw.us

Dragos Butucea-Boscoianu, Esq.
Access Law Group
1480 Renaissance Dr., Suite 308
Park Ridge, IL 60068
Telephone: (312) 880-7279
Email: Drey@AccessLaw.us

*Attorney for the Plaintiffs and the Putative Class Members*